FILED
ENTERED
LODGED
RECEIVED

MAY 0 3 2010

CLERK, U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

1  STUART J. WALD (SBN 173144)
   Law Offices of Stuart J. Wald
2  36154 Coffee Tree Place
   Murrieta, CA 90562
3  Telephone: (310) 429-3354
   Facsimile: (951) 894-4546
4
5  Attorney for Debtor and Debtor-in-Possession
   2151 Hotel Circle South, LLC
6
7              **UNITED STATES BANKRUPTCY COURT**
8              **SOUTHERN DISTRICT OF CALIFORNIA**
9
10  In re:                              Case No.: 10-07330-LA11
11  2151 HOTEL CIRCLE SOUTH, LLC,       Chapter 11
12         Debtor and Debtor-in-Possession   Motion for Order Authorizing Sale of Assets to
                                        Macino Entertainment Hollywood Corporation;
13                                      Memorandum of Points and Authorities;
    TIN: 33-0916069                     Declaration of Charles Crail; Declaration of
14                                      Adrian Van Rijs; Declaration of Stuart J. Wald
15                                      Date: June 17, 2010
16                                      Time: 2:30 p.m.
                                        Courtroom 118, Department 2
17                                      Jacob Weinberger U.S. Courthouse
                                        325 West F Street
18                                      San Diego, CA 92101
19      Chapter 11 Debtor and Debtor-in-Possession 2151 Hotel Circle South, LLC ("Debtor")
20  hereby moves the Court, pursuant to 11 U.S.C. §§ 363, Fed. R. Bankr. P. 2002 and 6004, and
21  Local Bankruptcy Rules 2002-2, 6004-1, 9013-3(b), 9014-1 through 9014-4, and Appendix D3,
22
23  for an order authorizing it to sell substantially all of its assets to Macino Entertainment
24  Hollywood Corporation ("Macino") for the sum of Fourteen Million Dollars ($14,000,000).
25  This sum will be more than sufficient to pay all of the Debtor's non-insider creditors in full
26  (including a secured claim of $11 million), and leave the case ready for dismissal prior to the end
27  of June.
28

The Debtor's primary asset is the Ramada Plaza Hotel, located at 2151 Hotel Circle South in San Diego, along with all related chattels for the operation of the hotel and its attached restaurant (the "Hotel"). The Hotel is encumbered by a deed of trust and assignment of rents in favor of G5 Global Partners IX, LLC, as assignee of Wells Fargo Bank, N.A. as Trustee for the Registered Holders of Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 1999-FNV1 ("Lender"), which secure a debt owed to Lender of approximately $11,000,000. The Hotel and its related assets have a current value of approximately $14,000,000 (as evidenced by the Macino offer), with approximately $30,000 in cash in its accounts.

The Macino offer has no lending or appraisal contingencies, and requires the Debtor only to provide two (2) standard third-party reports, on natural hazard zones and a phase one environmental survey report. Escrow has been opened with a $140,000 deposit, and is due to close no later than June 14, 2010, although it may be ready to close earlier than that date (subject to the Court's approval of this motion). Macino intends to subsequently re-design and upgrade the Hotel. The Debtor, post-closing, will be able to pay off all of its non-insider creditors in full, have this chapter 11 case dismissed (with payment of required fees to the Office of the United States Trustee), and proceed to self-liquidate outside of bankruptcy. This is a good faith sale which will benefit all of the parties involved.

This motion is based upon the notice given to the Lender and to all creditors of the estate, this motion and the attached memorandum of points and authorities, the Declarations of Charles Crail, Adrian Van Rys and Stuart J. Wald and their appended exhibits, and all other evidence before the Court submitted prior to or at the hearing on this motion. Opposition is due as per Local Bankruptcy Rule 9014-4(c).

1       WHEREFORE, the Court should grant this Motion, and allow the Debtor to sell the Hotel

2 and its related assets (real and chattel) in good faith to Macino for the sum of $14,000,000,

3 allowing it to pay off all of its non-insider creditors in full.

4

5

6 Date: May 3, 2010                   2151 HOTEL CIRCLE SOUTH, LLC

7

8

9                             By: _____

                                Stuart J. Wald, for

10                                 Law Offices of Stuart J. Wald

                                Attorney for Debtor/Debtor-in-Possession

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Motion for Sale of Assets- 3

## MEMORANDUM OF POINTS AND AUTHORITIES

This memorandum is submitted in support of the Debtor's motion for authority to sell substantially all of its assets to Macino Entertainment Hollywood Corporation.   All terms defined in the motion are similarly defined herein.

I.      The Debtor and its History

The Debtor is primarily owned and managed by Charles Crail.  Over the past forty (40) years, Mr. Crail has owned and operated a wide variety of real property developments, ranging from single-family structures to 200+ townhouse complexes.  He has also been involved in redeveloping and modernizing many of these projects, resulting in greatly-increased positive cash flows and net equity balances.

In June 2000, Mr. Crail, through the Debtor, took ownership of the Ramada Plaza Hotel, located at 2151 Hotel Circle South in San Diego's Mission Valley area.  Contemporaneously, the Debtor assumed liability for the secured debt owed to the Lender (that note having originally been made in the amount of $12,175,000 in December 1998 from Finova Realty Capital, Inc. to HIHC, LLC, the party which sold the hotel to Debtor).  Since that time, the Debtor has carried out eight (8) separate series of renovations and upgrades to the hotel property.  It currently has 182 rooms available for renting to guests (all with king or double queen-size beds), along with 2 meeting rooms, an award-winning restaurant, an English pub, a heated pool/spa/fitness center (new), and many other amenities.  Operating in full compliance with the standards of the Ramada Franchise Organization, the hotel is serviced 24 hours a day by trained security and concierge staff, and has an on-site general manager (Charles Halladay, of CH Management) who is on the Board of Directors of both the San Diego Convention & Visitors Bureau and the San Diego Hotel-Motel Association.

Due to recent economic disruptions, both in the area of the hotel and nationwide, the Debtor fell behind on its debt payments owed to Lender and its predecessor-in-interest. Debtor went through an abortive chapter 11 case from January-March 2010, which failed due to the lack of competence of Debtor's then-counsel. Facing moves by Lender's predecessor (and subsequently Lender) to install a receiver and carry out a non-judicial foreclosure, Debtor obtained new counsel[1] and filed a new bankruptcy case on April 8, but it was dismissed on April 14 due to a lack of evidence showing adequate protection of the interests of Lender's predecessor, and therefore it was not able to use cash collateral. The court (Judge Maureen Tighe) stated that she had no objection to the Debtor proceeding with a case in San Diego if its cash flow problem (authorization to use case) could be worked out. The secured obligation was subsequently assigned to Lender, which scheduled its own receivership hearing for April 29 and a foreclosure sale for April 30.

Over the past year, Debtor has explored various options to resolve its economic difficulties and its relationship with Lender's predecessor. It attempted to negotiate various workout agreements, but it could never get Lender's predecessor to agree to any reasonable terms. It marketed the Hotel for sale, and solicited third parties to investigate purchasing the secured obligation itself. None of these efforts resulted in a solid path out of the impasse. During the last week of April 2010, however, Macino expressed a strong interest in buying the Hotel for $14 million, as part of its plan to redevelop and upgrade the property. Debtor knew that the secured obligation had been assigned to Lender, and had received notice of a hearing on April 29 for the appointment of a receiver. Debtor contacted Lender (counsel to counsel), informed Lender about the Macino offer, and asked for a postponement of the April 30

---

[1] Debtor's new counsel's retainer does not derive from the rents and profits of the hotel, but rather was paid by Mr.

foreclosure sale contingent upon the escrow deposit being funded.  The deposit ($140,000) was made on April 29, but Lender notified Debtor late that afternoon that it was proceeding with the sale.  Debtor therefore filed the current petition with this Court early on the morning of April 30 (prior to the 10am foreclosure sale), and informed Lender of the filing.  Debtor was subsequently notified that Lender had changed counsel in favor of the attorneys who had represented Lender's predecessor in the Woodland Hills proceedings.

II.    The Sale Offer and Its Application

Myke Macino is the president of various entities, including Macino Entertainment Hollywood UK Ltd. (based in West Hollywood and Shepperton, England) and Silvertouch Holdings Worldwide Corporation (based in Dover, Delaware).  He has been a private backer of many motion pictures since 1998, with 31 production credits, and others as a playwright and screenwriter.  *See, e.g.,* www.myke-macino.com for more details on his life and business activities.

The Macino offer (attached hereto as Exhibit "1") is a flat $14 million dollar offer for the Hotel and all of the Debtor's related business assets.  $140,000 of the purchase price has been placed in escrow (through Van Rijs Escrow Company in Tarzana, California).  The balance will be funded by a loan commitment backed by a Macino $50 million stand-by letter of credit issued by HSBC, London.  The sale is contingent only upon two (2) reports to be provided by Debtor, a hazard zone disclosure report and a phase 1 environmental survey.  Debtor does not expect that either report will be problematic.  Escrow must closed by no later than June 14, 2010, although the parties may well be ready to close prior to that date (subject to the approval of this Court).

Crail from his personal funds.

According to the Lender's application for the appointment of a receiver, as of April 26, 2010, the secured obligation was approximately $11 million. The brokerage fee and related escrow costs for the sale will be approximately $300,000, and all other non-insider creditor claims (about 49, all claims other than that of Charles Crail) total approximately $159,000. Even with some additional costs and claims over these figures (such as a $13,000 fee to the Office of the United States Trustee for the 2nd quarter of 2010, based on total disbursements between $5 million and $15 million), the grand total is approximately $11.5 million, leaving a surplus of $2.5 million for the Debtor. With all of its creditors fully satisfied (other than the claim of Mr. Crail himself) and its non-cash assets liquidated, the Debtor will be able to (1) have the Court dismiss this case by no later than June 30, 2010; and (2) proceed with its dissolution under normal California law procedures, including the payment of its state tax obligations for 2010 (based on its gross receipts).

To the best knowledge of the Debtor, Macino has no known connections with the Debtor or its professionals, the creditors of the estate, the United States Trustee or any employee thereof, other than the proposed sale contract at bar. The Debtor will not have any relationship with Macino post-sale. The Debtor will also have no relationship with Lender (and has none know other than the debtor/secured creditor relationship), and Mr. Crail's guaranty of the debt will be exonerated by payment in full. Mr. Crail has not received any compensation from the Debtor for over a year (he has actually loaned substantial sums to it during that time). After the case is dismissed, he will likely use the net funds of the Debtor (after all other claims and obligations are fully satisfied) to repay himself some of the several millions of dollars he has loaned to the Debtor over the past years.

Motion for Sale of Assets- 7

III.     The Court Should Grant the Motion and Approve the Sale to Macino

       For a chapter 11 debtor to sell assets outside the ordinary course of its business, including of all business assets, it must demonstrate a business justification for the sale.  In re Lionel Corp., 722 F.2d 1063, 1071 (2nd Cir. 1983); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997); In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).  In the present case, the Debtor has operated its business at a loss for some time (when the full loan payments to the Lender are factored in).  It can now sell its business for more than enough money to satisfy all of its non-insider creditor claims, including that of the Lender.  The Lender has indicated that it does not want the Debtor to operate the Hotel any longer, and the sale to Macino will moot the need for a full plan of reorganization, or even for this case to proceed into the 3rd quarter of 2010.  Rather, all creditors can be paid in full, and the case dismissed by June 30.  As the interests of all parties are being benefited to the greatest extent, and to block the sale would lead to the loss of the Hotel to the Lender and resulting great damage to all of the other creditors of the estate, substantial justification exists for the sale, and the Court should approve the Motion.

IV.     Conclusion

       For the reasons stated herein, the Court should approve the good-faith sale of the Hotel and all of its related assets to Macino.

Date: May 3, 2010

                     2151 HOTEL CIRCLE SOUTH, LLC

                     By: _____

                         Stuart J. Wald, for
                        Law Offices of Stuart J. Wald
                     Attorney for Debtor/Debtor-in-Possession

Motion for Sale of Assets- 8

## DECLARATION OF CHARLES CRAIL

I, Charles Crail, declare as follows:

1.      I am a managing member of the Chapter 11 Debtor and Debtor-in-Possession in this case.  I make this declaration based upon my personal knowledge and, if called upon to testify, could and would testify truthfully thereto.  My representations with regard to the status and budgetary projections of the Debtor's business are based upon the Debtor's business records.  These records are regularly kept in the ordinary course of the Debtor's business, contemporaneously with the events recorded therein, by or from information transmitted by persons with knowledge of the source of said information.

2.      The Debtor is primarily owned and managed by me.  My wife and children own portions of the Debtor, and CH Management, a sole proprietorship of Mr. Charles Halladay, provides on-site management.

3.      The Debtor's primary asset is the Ramada Plaza Hotel, located at 2151 Hotel Circle South in San Diego, along with all related chattels for the operation of the hotel and its attached restaurant.  The hotel is encumbered by a deed of trust and assignment of rents in favor of G5 Global Partners IX, LLC, as assignee of Wells Fargo Bank, N.A. as Trustee for the Registered Holders of Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 1999-FNV1 ("Lender").

4.      Over the past forty (40) years, my wife and I have owned and operated a wide variety of real property developments, ranging from single-family structures to 200+ townhouse complexes.  I have also been involved in redeveloping and modernizing many of these projects, resulting in greatly-increased positive cash flows and net equity balances.

5.      In June 2000, the Debtor took ownership of the Hotel, located in San Diego's Mission Valley area.  Contemporaneously, the Debtor assumed liability for the secured debt now owed to the Lender (that note having originally been made in the amount of $12,175,000 in

Motion for Sale of Assets- 9

December 1998 from Finova Realty Capital, Inc. to HIHC, LLC, the party which sold the hotel to Debtor).

6.      Since that time, the Debtor has carried out eight (8) separate series of renovations and upgrades to the hotel property.  It currently has 182 rooms available for renting to guests (all with king or double queen-size beds), along with 2 meeting rooms, an award-winning restaurant, an English pub, a heated pool/spa/fitness center (new), and many other amenities.  Operating in full compliance with the standards of the Ramada Franchise Organization, the hotel is serviced 24 hours a day by trained security and concierge staff, and has an on-site general manager (Charles Halladay, of CH Management) who is on the Board of Directors of both the San Diego Convention & Visitors Bureau and the San Diego Hotel-Motel Association.

7.      Due to recent economic disruptions, both in the area of the hotel and nationwide, the Debtor fell behind on its debt payments owed to Lender's predecessors.  Debtor went through an abortive chapter 11 case from January-March 2010 (in the Central District of California, San Fernando Valley Division), which failed due to the lack of competence of Debtor's then-counsel. Facing moves by Lender's predecessor (and subsequently Lender) to install a receiver and carry out a non-judicial foreclosure, Debtor filed a new bankruptcy case on April 8, but it was dismissed on April 14 due to a lack of evidence showing adequate protection of the interests of Lender's predecessor, and therefore it was not able to use cash collateral.  The court (Judge Maureen Tighe) stated that she had no objection to the Debtor proceeding with a case in San Diego if its cash flow problem (authorization to use case) could be worked out.  I understand that the note was then assigned to Lender, which scheduled its own receivership hearing for April 29 and a foreclosure sale for April 30.

8.      Over the past year, Debtor has explored various options to resolve its economic difficulties and its relationship with Lender's predecessor.  It attempted to negotiate various workout agreements, but it could never get Lender's predecessor to agree to any reasonable terms.  It marketed the Hotel for sale, and solicited third parties to investigate purchasing the secured obligation itself.  None of these efforts resulted in a solid path out of the impasse.  During the last week of April 2010, however, Macino Entertainment Hollywood Corporation (one of Mr. Myke Macino's vehicles) expressed a strong interest in buying the Hotel for $14 million, as part of its plan to redevelop and upgrade the property.

9.      I knew that the secured obligation had been assigned to Lender, and had received notice of a hearing on April 29 for the appointment of a receiver.  I had Debtor's attorney contact Lender's counsel to inform Lender about the Macino offer and ask for a postponement of the April 30 foreclosure sale contingent upon the escrow deposit being funded.  The deposit ($140,000) was made on April 29, but Lender notified Debtor late that afternoon that it was proceeding with the sale.  Debtor therefore filed the current petition with this Court early on the morning of April 30 (prior to the 10am foreclosure sale), and informed Lender of the filing.  Debtor was subsequently notified that Lender had changed counsel in favor of the attorneys who had represented Lender's predecessor in the Woodland Hills proceedings.

10.     A true and correct copy of the Macino offer is attached hereto as Exhibit "1".

11.     The Macino offer is a flat $14 million dollar offer for the Hotel and all of the Debtor's related business assets.  I have been informed and believe that $140,000 of the purchase price has been placed in escrow (through Van Rijs Escrow Company in Tarzana, California).  The balance will be funded by a loan commitment backed by a Macino $50 million stand-by letter of credit issued by HSBC, London.  The sale is contingent only upon two (2) reports to be

provided by Debtor, a hazard zone disclosure report and a phase 1 environmental survey. I do not expect that either report will be problematic. Escrow must closed by no later than June 14, 2010, although the parties may well be ready to close prior to that date (subject to the approval of this Court).

12.    According to the Lender's application for the appointment of a receiver, as of April 26, 2010, the secured obligation was approximately $11 million. The brokerage fee and related escrow costs for the sale will be approximately $300,000, and all other non-insider creditor claims (about 49, all claims other than mine) total approximately $159,000. Even with some additional costs and claims over these figures (such as a $13,000 fee to the Office of the United States Trustee for the 2nd quarter of 2010, based on total disbursements between $5 million and $15 million), the grand total is approximately $11.5 million, leaving a surplus of $2.5 million for the Debtor.

13.    With all of its creditors fully satisfied (other than myself) and its non-cash assets liquidated, the Debtor will be able to (1) have the Court dismiss this case by no later than June 30, 2010; and (2) proceed with its dissolution under normal California law procedures, including the payment of its state tax obligations for 2010 (based on its gross receipts).

14.    To my best knowledge, Macino has no known connections with myself, the Debtor or its professionals, the creditors of the estate, the United States Trustee or any employee thereof, other than the proposed sale contract at bar. Neither I nor the Debtor will not have any relationship with Macino post-sale. The Debtor will also have no relationship with the Lender (and has none know other than the debtor/secured creditor relationship), and my guaranty of the debt will be exonerated by payment in full.

15.     I have not received any compensation from the Debtor for over a year (I have actually loaned substantial sums to it during that time).  After the case is dismissed, I will likely use the net funds of the Debtor (after all other claims and obligations are fully satisfied) to repay myself some of the several millions of dollars I have loaned to the Debtor over the past years.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 3rd day of May, 2010, at Woodland Hills, California.


/s/
Charles Crail

15.     I have not received any compensation from the Debtor for over a year (I have actually loaned substantial sums to it during that time).  After the case is dismissed, I will likely use the net funds of the Debtor (after all other claims and obligations are fully satisfied) to repay myself some of the several millions of dollars I have loaned to the Debtor over the past years.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 3rd day of May, 2010, at Woodland Hills, California.


_____
Charles Crail

## DECLARATION OF ADRIAN VAN RIJS

I, Adrian Van Rijs, declare as follows:

1.      I am the principal of Van Rijs Realtors and Van Rijs Escrow Division in Tarzana, California.  I make this declaration based upon my personal knowledge and, if called upon to testify, could and would testify truthfully thereto.

2.      I am the broker for the proposed sale of the Ramada Plaza Hotel (and all related property) in San Diego to Macino Entertainment Hollywood Corporation.  According to my investigation, Myke Macino is the president of various entities, including Macino Entertainment Hollywood UK Ltd. (based in West Hollywood and Shepperton, England) and Silvertouch Holdings Worldwide Corporation (based in Dover, Delaware).  He has been a private backer of many motion pictures since 1998, with 31 production credits, and others as a playwright and screenwriter.  Among other sources, I reviewed his website, www.myke-macino.com for information on his life and business activities.

3.      The Macino offer is a flat $14 million dollar offer for the Hotel and all of the Debtor's related business assets.  $140,000 of the purchase price has been placed in escrow with Van Rijs Escrow Company.  The balance will be funded by a loan commitment backed by a Macino $50 million stand-by letter of credit issued by HSBC, London.  The sale is contingent only upon two (2) reports, a hazard zone disclosure report and a phase 1 environmental survey, and the Debtor and I are moving to provide those reports.  Escrow must closed by no later than June 14, 2010, although the parties may well be ready to close prior to that date (subject to the approval of this Court).

\\\

\\\

4.      I understand that the secured obligation encumbering the Hotel is approximately $11 million.  My brokerage fee for this transaction will be 2% of the purchase price, $280,000.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 3rd day of May, 2010, at Tarzana, California.


/s/
Adrian Van Rijs

4.    I understand that the secured obligation encumbering the Hotel is approximately $11 million.  My brokerage fee for this transaction will be 2% of the purchase price, $280,000.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 3rd day of May, 2010, at Tarzana, California.

/s/
Adrian Van Rijs

## DECLARATION OF STUART J. WALD

I, Stuart J. Wald, declare as follows:

1.      I am an attorney qualified to practice before this Court, and counsel for the Chapter 11 Debtor in this action.  I make this declaration based upon my personal knowledge and, if called upon to testify, could and would testify truthfully thereto.

2.      I have reviewed the Court's Appendix D3 regarding sales of substantially all assets of debtors early in bankruptcy cases, and have prepared this declaration to respond to the issues raised therein calling for the declaration of counsel.

(a)      I was originally retained by the Debtor on April 5, 2010, to represent the Debtor with regard to reviving its chapter 11 case before the U.S. Bankruptcy Court for the Central District of California, San Fernando Valley Division, where it had originally been filed by other counsel.  I received a retainer, from Charles Crail's personal funds (not those of the Debtor), in the amount of $8,039, from which I paid the $1,039 filing fee.  I was to receive a further $8,000 in 60 days, but the case was dismissed on April 14, rendering moot the additional retainer funds.  Including post-hearing discussions with Mr. Crail, I generally exhausted the retainer.  On April 26, 2010, I was retained by the Debtor to perform additional services with regard to the current case, and was again provided by Mr. Crail the sum of $8,039, with the balance if any of my fees to be paid upon the dismissal of the case after the sale to Macino.  Since that date, I have incurred approximately $4,200 in fees ($300/hour) and expenses, not including the drafting of this motion and others to be filed on May 3, 2010.

(b)      I have had no communications with creditors of the estate other than the Lender, through the attorneys it utilized until April 30, 2010 (Lynn Galuppo of Cox, Castle and Nicholson) and therefore (Steven Polard of Perkins Coie).  My discussions (and limited e-mails) with these counsel have involved proposals to postpone the foreclosure sale to allow the Macino

sale to close, and to avoid a dispute over cash collateral by having the receiver appointed on April 29, 2010 remain in place pending the closing of the Macino sale.

(c)    All of the Debtor's equity is held by Mr. Charles Crail and his immediate family. I have only dealt with him as the managing member, although I also met his wife during the previous case and she was in full agreement with the course of conduct laid out by Mr. Crail.

(d)-(e)  No creditor's committee has been formed to my knowledge.

(f)    The only contingencies to the Macino sale are the hazard zone report and the phase 1 environmental report. There are no contingencies for financing or a new appraisal. A copy of the sale contract is attached to Mr. Crail's declaration.

(g)    I have attached hereto as Exhibit "2" a true and correct copy of the list of the 20 largest non-insider creditors, with phone numbers included where known to the Debtor.

(h)    If the Hotel pays its ordinary business debts as they come due, the only administrative debts to be paid will be my fees, the brokerage commission, and the fees due to the Office of the United States Trustee. The brokerage commission will be paid from escrow upon sale, and the UST fees upon dismissal. My fees will be paid post-dismissal.

(i)    The sale is for a gross of $14 million. $11 million will go to the Lender, and about $300,000 to the brokerage/escrow. Other creditor claims (including UST fees should be $200,000 or less. The balance of the funds will be left in the LLC for repayment of Mr. Crail's claim and post-bankruptcy liquidation costs.

(j)    Other than a minor real property claim and a separate secured claim for the Hotel's computer system, the Lender has the only secured claim of about $11 million. There are approximately $73,000 in priority tax liabilities, and all employee claims are paid except for

the two weeks of wages immediately pre-petition; these should be paid in the ordinary course of business. All other creditor claims are vendors of one type or another.

(k)   The Lender (and any real property taxes), and the brokerage/escrow fees, will all be paid in full upon closing. The Debtor will then seek dismissal of its case by no later than June 30, 2010, simultaneously paying in full all non-insider, non-professional creditor claims, including all quarterly fees owed to the UST. My fees will be resolved post-petition, and the balance of the Debtor's funds, after allowing for liquidation and 2010 tax costs, will be paid to Mr. Crail in reimbursement of his loans to the Debtor (well over $3.5 million in total).

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 3rd day of May, 2010, at Murrieta, California.

_____
Stuart J. Wald

# EXHIBIT 1

**CALIFORNIA ASSOCIATION OF REALTORS®**

# COMMERCIAL PROPERTY PURCHASE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS
### (NON-RESIDENTIAL)
(C.A.R. Form CPA, Revised 10/02)

Date **April 23, 2010**, at **Los Angeles**, California.

**1. OFFER:**

A. **THIS IS AN OFFER FROM** **Marino Entertainment Hollywood Corporation** ("Buyer")
☐ Individual(s), ☐ A Corporation, ☐ A Partnership, ☐ An LLC, ☐ An LLP, or ☑ Other

B. **THE REAL PROPERTY TO BE ACQUIRED** is described as **2151 Hotel Circle South**, Assessor's Parcel No. _____, situated in **San Diego**, County of **San Diego**, California, ("Property").

C. **THE PURCHASE PRICE** offered is **Fourteen Million** Dollars $ **14,000,000.00**

D. **CLOSE OF ESCROW** shall occur on _____ (date) (or ☑ **45** Days After Acceptance).

**2. FINANCE TERMS:** Obtaining the loans below is a contingency of this Agreement unless: (i) either 2L or 2M is checked below; or (ii) otherwise agreed in writing. Buyer shall act diligently and in good faith to obtain the designated loans. Obtaining deposit, down payment and closing costs is not a contingency. Buyer represents that funds will be good when deposited with Escrow Holder.

A. **INITIAL DEPOSIT:** Buyer has given a deposit in the amount of ................ $ **140,000.00**
to the agent submitting the offer (or to ☐ _____), by Personal Check
(or ☑ **wire transfer** ), made payable to **Van Rijs Escrow Division**
which shall be held uncashed until Acceptance and then deposited within 3 business days after
Acceptance or ☑ **receipt of loan commitment against HSBC Letter of Credit**
with Escrow Holder, or ☐ into Broker's trust account.

B. **INCREASED DEPOSIT:** Buyer shall deposit with Escrow Holder an increased deposit in the amount of ..... $ _____
within _____ Days After Acceptance, or ☐

C. **FIRST LOAN IN THE AMOUNT OF** ................................................................ $ _____
NEW First Deed of Trust in favor of ☐ Lender, ☐ Seller.
OR ☐ ASSUMPTION of (or ☐ "subject to") Existing First Deed of Trust encumbering the Property, securing
a note payable at maximum interest of _____ % fixed rate, or _____ % initial adjustable
rate with a maximum interest rate of _____ %, balance due in _____ years, amortized over
_____ years. (if checked: ☐ and with a margin not to exceed _____ %, tied to the following
index _____ .) Buyer shall pay loan fees/points not to exceed _____
Additional terms _____

D. **SECOND LOAN IN THE AMOUNT OF** ......................................................... $ _____
NEW Second Deed of Trust in favor of ☐ Lender, ☐ Seller.
OR ☐ ASSUMPTION of (or ☐ "subject to") Existing Second Deed of Trust encumbering the Property,
securing a note payable at maximum interest of **7.500** % fixed rate or _____ %
initial adjustable rate with a maximum interest rate of _____ %, balance due in **5** years,
amortized over _____ years. (if checked: ☐ and with a margin not to exceed _____ % tied to
the following index _____ .) Buyer shall pay loan fees/points not to exceed _____
Additional terms **I** _____

E. **ADDITIONAL FINANCING TERMS:** ......................................................... $ _____

F. **BALANCE OF PURCHASE PRICE** (not including costs of obtaining loans and other closing costs) in the amount of . $ **13,860,000.00**
to be deposited with Escrow Holder within sufficient time to close escrow.

G. **PURCHASE PRICE (TOTAL):** ............................................................ $ **14,000,000.00**

H. **LOAN APPLICATIONS:** Within 7 (or ☐ _____) Days After Acceptance, Buyer shall provide Seller a letter from lender or mortgage loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified above.

I. **VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS:** Buyer (or Buyer's lender or loan broker pursuant to 2H) shall, within 7 (or ☑ **14** ) Days After Acceptance, provide Seller written verification of Buyer's down payment and closing costs.

J. **LOAN CONTINGENCY REMOVAL:** (i) Within 17 (or ☐ _____) Days After Acceptance Buyer shall, as specified in Paragraph 17, remove the loan contingency or cancel this Agreement; OR (ii) (if checked) ☐ loan contingency shall remain in effect until the designated loans are funded.

K. **APPRAISAL CONTINGENCY AND REMOVAL:** This Agreement is (OR, if checked, ☑ is NOT) contingent upon the Property appraising at no less than the specified purchase price. If there is a loan contingency, at the time the loan contingency is removed (or, if checked, ☐ within 17 (or _____) Days After Acceptance), Buyer shall, as specified in paragraph 17, remove the appraisal contingency or cancel this Agreement. If there is no loan contingency, Buyer shall, as specified in paragraph 17, remove the appraisal contingency within 17 (or _____) Days After Acceptance.

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2002 CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.

Buyer's Initials ( _____ ) ( _____ )
Seller's Initials ( _____ ) ( _____ )
Reviewed by _____ Date _____

CPA REVISED 10/02 (PAGE 1 OF 10)

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 1 OF 10)**

2151 Hotel Circle South

Property Address: __San Diego, CA  92108__                                    Date: __April 23, 2010__

L. ☐ **NO LOAN CONTINGENCY** (If checked): Obtaining any loan, in paragraphs 2C, 2D, 2E or elsewhere in this Agreement, is NOT a contingency of this Agreement. If Buyer does not obtain the loan and as a result Buyer does not purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.

M. ☒ **ALL CASH OFFER** (If checked): No loan is needed to purchase the Property. Buyer shall, within 7 (or ☒ __14__ ) Days After Acceptance, provide Seller written verification of sufficient funds to close this transaction.

N. **SELLER FINANCING:** For any Seller financing designated above, Buyer is to execute a note secured by a deed of trust in favor of Seller, on the terms and conditions set forth in the attached addendum (C.A.R. Form SFA).

O. **ASSUMED OR "SUBJECT TO" FINANCING:** Seller represents that Seller is not delinquent on any payments due on any loans. Seller shall, within the time specified in paragraph 17, provide Copies of all applicable notes and deeds of trust, loan balances and current interest rates to Buyer. Buyer shall then, as specified in paragraph 17, remove this contingency or cancel this Agreement. Differences between estimated and actual loan balances shall be adjusted at Close Of Escrow by cash down payment. Impound accounts, if any, shall be assigned and charged to Buyer and credited to Seller. Seller is advised that Buyer's assumption of an existing loan may not release Seller from liability on that loan. If the Property is acquired subject to an existing loan, Buyer and Seller are advised to consult with legal counsel regarding the ability of an existing lender to call the loan due, and the consequences thereof.

3. **CLOSING AND OCCUPANCY:**
   A. **Seller-Occupied or Vacant Units:** Occupancy shall be delivered to Buyer at __12__ ☒ AM ☐ PM, ☒ on the date of Close Of Escrow; ☐ on _____ ; or ☐ no later than _____ Days After Close Of Escrow. (C.A.R. Form PAA, paragraph 2.) If transfer of title and occupancy do not occur at the same time, Buyer and Seller are advised to: (i) enter into a written occupancy agreement; and (ii) consult with their insurance and legal advisors.
   B. **Tenant-Occupied Units:** Possession and occupancy, subject to the rights of tenants under existing leases, shall be delivered to Buyer on Close Of Escrow.
   C. At Close Of Escrow, Seller assigns to Buyer any assignable warranty rights for items included in the sale and shall provide any available Copies of such warranties. Brokers cannot and will not determine the assignability of any warranties.
   D. At Close Of Escrow, unless otherwise agreed in writing, Seller shall provide keys and/or means to operate all locks, mailboxes, security systems, alarms and garage door openers. If the Property is a unit in a condominium or located in a common-interest subdivision, Buyer may be required to pay a deposit to the Owners' Association ("OA") to obtain keys to accessible OA facilities.

4. **SECURITY DEPOSITS:** Security deposits, if any, to the extent they have not been applied by Seller in accordance with any rental agreement and current Law, shall be transferred to Buyer on Close Of Escrow. Seller shall notify each tenant, in compliance with the Civil Code.

5. **ALLOCATION OF COSTS** (If checked): Unless otherwise specified here, this paragraph only determines who is to pay for the report, inspection, test or service mentioned. If not specified here or elsewhere in this Agreement, the determination of who is to pay for any work recommended or identified by any such report, inspection, test or service is by the method specified in paragraph 17.
   A. **INSPECTIONS AND REPORTS:**
      (1) ☐ Buyer ☐ Seller shall pay for sewer connection, if required by Law prior to Close Of Escrow _____
      (2) ☐ Buyer ☐ Seller shall pay to have septic or private sewage disposal system inspected _____
      (3) ☐ Buyer ☐ Seller shall pay to have domestic wells tested for water potability and productivity _____
      (4) ☐ Buyer ☒ Seller shall pay for a natural hazard zone disclosure report prepared by __First American Hazard__
      (5) ☐ Buyer ☐ Seller shall pay for the following inspection or report _____
      (6) ☐ Buyer ☐ Seller shall pay for the following inspection or report _____
   B. **GOVERNMENT REQUIREMENTS AND RETROFIT:**
      (1) ☐ Buyer ☐ Seller shall pay for smoke detector installation and/or water heater bracing, if required by Law. Prior to Close Of Escrow, Seller shall provide Buyer a written statement of compliance in accordance with state and local Law, unless exempt.
      (2) ☐ Buyer ☐ Seller shall pay the cost of compliance with any other minimum mandatory government retrofit standards, inspections and reports if required as a condition of closing escrow under any Law.
      (3) ☐ Buyer ☐ Seller shall pay for installation of approved fire extinguisher(s), sprinkler(s), and hose(s), if required by Law, which shall be installed prior to Close Of Escrow. Prior to Close Of Escrow Seller shall provide Buyer a written statement of compliance, if required by Law.
   C. **ESCROW AND TITLE:**
      (1) ☒ Buyer ☒ Seller shall pay escrow fee __each party to pay their own fees__
          Escrow Holder shall be __Van Nuys Escrow Division__
      (2) ☐ Buyer ☒ Seller shall pay for owner's title insurance policy specified in paragraph 16 __Lawyers Title Co__
          Owner's title policy to be issued by __Lawyers Title Co__
          (Buyer shall pay for any title insurance policy insuring Buyer's lender, unless otherwise agreed in writing.)
   D. **OTHER COSTS:**
      (1) ☐ Buyer ☒ Seller shall pay County transfer tax or transfer fee _____
      (2) ☐ Buyer ☒ Seller shall pay City transfer tax or transfer fee _____
      (3) ☐ Buyer ☐ Seller shall pay OA transfer fees _____
      (4) ☐ Buyer ☐ Seller shall pay OA document preparation fees _____
      (5) ☐ Buyer ☐ Seller shall pay for _____
      (6) ☐ Buyer ☐ Seller shall pay for _____

Buyer's Initials ( ____ )( ____ )
Seller's Initials ( ____ )( ____ )
Reviewed by _____ Date ____

Copyright © 1991-2007, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 2 OF 10)

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 2 OF 10)**

2151 Hotel Ci

2151 Hotel Circle South

Property Address: San Diego, CA  92108          Date: April 23, 2010

6. **SELLER DISCLOSURES:**

    A. **NATURAL AND ENVIRONMENTAL DISCLOSURES:** Seller shall, within the time specified in paragraph 17, if required by Law: (i) deliver to Buyer earthquake guides (and questionnaire) and environmental hazards booklet; (ii) even if exempt from the obligation to provide an NHD, disclose if the Property is located in a Special Flood Hazard Area; Potential Flooding (Inundation) Area; Very High Fire Hazard Zone; State Fire Responsibility Area; Earthquake Fault Zone; Seismic Hazard Zone; and (iii) disclose any other zone as required by Law and provide any other information required for those zones.

    B. **ADDITIONAL DISCLOSURES:** Within the time specified in paragraph 17, Seller shall provide to Buyer, in writing, the following disclosures, documentation and information:

        (1) **RENTAL SERVICE AGREEMENTS:** (i) All current leases, rental agreements, service contracts, and other agreements pertaining to the operation of the Property; and (ii) a rental statement including names of tenants, rental rates, period of rental, date of last rent increase, security deposits, rental concessions, rebates, or other benefits, if any, and a list of delinquent rents and their duration. Seller represents that no tenant is entitled to any concession, rebate, or other benefit, except as set forth in these documents.

        (2) **INCOME AND EXPENSE STATEMENTS:** The books and records, including a statement of income and expense for the 12 months preceding Acceptance. Seller represents that the books and records are those maintained in the ordinary and normal course of business, and used by Seller in the computation of federal and state income tax returns.

        (3) ☐ **TENANT ESTOPPEL CERTIFICATES:** (If checked) Tenant estoppel certificates (C.A.R. Form TEC) completed by Seller or Seller's agent, and signed by tenants, acknowledging: (i) that tenants' rental or lease agreements are unmodified and in full force and effect (or if modified, stating all such modifications); (ii) that no lessor defaults exist; and (iii) stating the amount of any prepaid rent or security deposit.

        (4) **SURVEYS, PLANS AND ENGINEERING DOCUMENTS:** Copies of surveys, plans, specifications and engineering documents, if any, in Seller's possession or control.

        (5) **PERMITS:** If in Seller's possession, Copies of all permits and approvals concerning the Property, obtained from any governmental entity, including, but not limited to, certificates of occupancy, conditional use permits, development plans, and licenses and permits pertaining to the operation of the Property.

        (6) **STRUCTURAL MODIFICATIONS:** Any known structural additions or alterations to, or the installation, alteration, repair or replacement of, significant components of the structure(s) upon the Property.

        (7) **GOVERNMENTAL COMPLIANCE:** Any improvements, additions, alterations or repairs made by Seller, or known to Seller to have been made, without required governmental permits, final inspections, and approvals.

        (8) **VIOLATION NOTICES:** Any notice of violations of any Law filed or issued against the Property and actually known to Seller.

        (9) **MISCELLANEOUS ITEMS:** Any of the following, if actually known to Seller: (i) any current pending lawsuit(s), investigation(s), inquiry(ies), action(s), or other proceeding(s) affecting the Property, or the right to use and occupy it; (ii) any unsatisfied mechanic's or materialmen's lien(s) affecting the Property; and (iii) that any tenant of the Property is the subject of a bankruptcy.

7. ☒ **ENVIRONMENTAL SURVEY** (If checked): Within   **14**   Days After Acceptance. Buyer shall be provided a phase one environmental survey report paid for and obtained by ☐ Buyer ☒ Seller. Buyer shall then, as specified in paragraph 17, remove this contingency or cancel this Agreement.

8. **CONDOMINIUM/PLANNED UNIT DEVELOPMENT DISCLOSURES:**

    A. **SELLER HAS:** 7 (or ☐ _____ ) Days After Acceptance to disclose to Buyer whether the Property is a condominium, or located in a planned unit development or other common interest subdivision.

    B. If Property is a condominium, or located in a planned unit development or other common interest subdivision, Seller has 3 (or ☐ _____ ) Days After Acceptance to request from the OA (C.A.R. Form HOA): (i) Copies of any documents required by Law; (ii) disclosure of any pending or anticipated claim or litigation by or against the OA; (iii) a statement containing the location and number of designated parking and storage spaces; (iv) Copies of the most recent 12 months of OA minutes for regular and special meetings; and (v) the names and contact information of all OA's governing the Property. (Collectively, "CI Disclosures.") Seller shall itemize and deliver to Buyer all CI Disclosures received from the OA and any CI Disclosures in Seller's possession. Buyer's approval of CI Disclosures is a contingency of this Agreement as specified in paragraph 17.

9. **SUBSEQUENT DISCLOSURES:** In the event Seller, prior to Close Of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information or representations previously provided to Buyer of which Buyer is otherwise unaware, Seller shall promptly provide a subsequent or amended disclosure or notice in writing, covering those items. However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies disclosed in reports ordered and paid for by Buyer.

10. **CHANGES DURING ESCROW:**

    A. Prior to Close Of Escrow, Seller may only engage in the following acts, ("Proposed Changes"), subject to Buyer's rights in paragraph 17: (i) rent or lease any vacant unit or other part of the premises; (ii) alter, modify, or extend any existing rental or lease agreement; (iii) enter into, alter, modify or extend any service contract(s); or (iv) change the status of the condition of the Property.

    B. At least 7 (or ☐ _____ ) Days prior to any Proposed Changes, Seller shall give written notice to Buyer of any Proposed Changes.

Copyright © 1991-2007, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 3 OF 10)

Buyer's Initials ( _____ )( _____ )
Seller's Initials ( _____ )( _____ )
Reviewed by _____ Date _____



**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 3 OF 10)**

2151 Hotel Cir

**2151 Hotel Circle South**

Property Address: San Diego, CA 92108                Date: **April 23, 2010**

**11. CONDITIONS AFFECTING PROPERTY:**

A. Unless otherwise agreed: (i) the Property is sold (a) in its PRESENT physical condition as of the date of Acceptance and (b) subject to Buyer's Investigation rights; (ii) the Property, including pool, spa, landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance; and (iii) all debris and personal property not included in the sale shall be removed by Close Of Escrow.

B. SELLER SHALL, within the time specified in paragraph 17, DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS affecting the Property, including known insurance claims within the past five years, AND MAKE OTHER DISCLOSURES REQUIRED BY LAW.

C. NOTE TO BUYER: You are strongly advised to conduct investigations of the entire Property in order to determine its present condition since Seller may not be aware of all defects affecting the Property or other factors that you consider important. Property improvements may not be built according to code, in compliance with current Law, or have had permits issued.

D. NOTE TO SELLER: Buyer has the right to inspect the Property and, as specified in paragraph 17, based upon information discovered in those inspections: (i) cancel this Agreement; or (ii) request that you make Repairs or take other action.

**12. ITEMS INCLUDED AND EXCLUDED:**

A. NOTE TO BUYER AND SELLER: Items listed as included or excluded in the MLS, flyers or marketing materials are not included in the purchase price or excluded from the sale unless specified in 12B or C.

B. ITEMS INCLUDED IN SALE:

(1) All EXISTING fixtures and fittings that are attached to the Property.

(2) Existing electrical, mechanical, lighting, plumbing and heating fixtures, ceiling fans, fireplace inserts, gas logs and grates, solar systems, built-in appliances, window and door screens, awnings, shutters, window coverings, attached floor coverings, television antennas, satellite dishes, private integrated telephone systems, air coolers/conditioners, pool/spa equipment, garage door openers/remote controls, mailbox, in-ground landscaping, trees/shrubs, water softeners, water purifiers, security systems/alarms.

(3) A complete inventory of all personal property of Seller currently used in the operation of the Property and included in the purchase price shall be delivered to Buyer within the time specified in paragraph 17.

(4) Seller represents that all items included in the purchase price are, unless otherwise specified, owned by Seller. Within the time specified in paragraph 17, Seller shall give Buyer a list of fixtures not owned by Seller.

(5) Seller shall deliver title to the personal property by Bill of Sale, free of all liens and encumbrances, and without warranty of condition.

(6) As additional security for any note in favor of Seller for any part of the purchase price, Buyer shall execute a UCC-1 Financing Statement to be filed with the Secretary of State, covering the personal property included in the purchase, replacement thereof, and insurance proceeds.

C. ITEMS EXCLUDED FROM SALE: Any property belonging to others.

**13. BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:**

A. Buyer's acceptance of the condition of, and any other matter affecting the Property is a contingency of this Agreement, as specified in this paragraph and paragraph 17. Within the time specified in paragraph 17, Buyer shall have the right, at Buyer's expense unless otherwise agreed, to conduct inspections, investigations, tests, surveys and other studies ("Buyer Investigations"), including, but not limited to, the right to: (i) inspect for lead-based paint and other lead-based paint hazards; (ii) inspect for wood destroying pests and organisms; (iii) confirm the insurability of Buyer and the Property; and (iv) satisfy Buyer as to any matter of concern to Buyer. Without Seller's prior written consent, Buyer shall neither make nor cause to be made: (i) invasive or destructive Buyer Investigations; or (ii) inspections by any governmental building or zoning inspector, or government employee, unless required by Law.

B. Buyer shall complete Buyer Investigations and, as specified in paragraph 17, remove the contingency or cancel this Agreement. Buyer shall give Seller, at no cost, complete Copies of all Buyer Investigation reports obtained by Buyer. Seller shall make Property available for all Buyer Investigations. Seller shall have water, gas, electricity, and all operable pilot lights on for Buyer's Investigations and through the date possession is made available to Buyer.

**14. REPAIRS:** Repairs shall be completed prior to final verification of condition unless otherwise agreed in writing. Repairs to be performed at Seller's expense may be performed by Seller or through others, provided that the work complies with applicable Law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. Seller shall: (i) obtain receipts for Repairs performed by others; (ii) prepare a written statement indicating the Repairs performed by Seller and the date of such Repairs; and (iii) provide Copies of receipts and statements to Buyer prior to final verification of condition.

**15. BUYER INDEMNITY AND SELLER PROTECTION FOR ENTRY UPON PROPERTY:** Buyer shall: (i) keep the Property free and clear of liens; (ii) Repair all damage arising from Buyer Investigations; and (iii) indemnify and hold Seller harmless from all resulting liability, claims, demands, damages and costs. Buyer shall carry, or Buyer shall require anyone acting on Buyer's behalf to carry policies of liability, workers' compensation and other applicable insurance, defending and protecting Seller from liability for any injuries to persons or property occurring during any Buyer Investigations or work done on the Property at Buyer's direction prior to Close Of Escrow. Seller is advised that certain protections may be afforded Seller by recording a "Notice of Non-Responsibility" (C.A.R. Form NNR) for Buyer Investigations and work done on the Property at Buyer's direction. Buyer's obligations under this paragraph shall survive the termination of this Agreement.

Copyright © 1991-2007, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 4 OF 10)

Buyer's Initials ( _____ ) ( _____ )
Seller's Initials ( _____ ) ( _____ )
Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 4 OF 10)**

2151 Hotel Cir

**2151 Hotel Circle South**

Property Address: San Diego, CA  92108                                          Date: April 23, 2010

**16.  TITLE AND VESTING:**

A.  Within the time specified in paragraph 17, Buyer shall be provided a current preliminary (title) report, which is only an offer by the title insurer to issue a policy of title insurance and may not contain every item affecting title. Buyer's review of the preliminary report and any other matters which may affect title are a contingency of this Agreement as specified in paragraph 17.

B.  Title is taken in its present condition subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other matters, whether of record or not, as of the date of Acceptance except: (i) monetary liens of record unless Buyer is assuming those obligations or taking the property subject to those obligations; and (ii) those matters which Seller has agreed to remove in writing.

C.  Within the time specified in paragraph 17, Seller has a duty to disclose to Buyer all matters known to Seller affecting title, whether of record or not.

D.  At Close Of Escrow, Buyer shall receive a grant deed conveying title (or, for stock cooperative or long-term lease, an assignment of stock certificate or of Seller's leasehold interest), including oil, mineral and water rights if currently owned by Seller. Title shall vest as designated in Buyer's supplemental escrow instructions. **THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT LEGAL AND TAX CONSEQUENCES. CONSULT AN APPROPRIATE PROFESSIONAL.**

E.  Buyer shall receive a standard coverage owner's CLTA policy of title insurance. An ALTA policy or the addition of endorsements may provide greater coverage for Buyer. A title company, at Buyer's request, can provide information about the availability, desirability, coverage, and cost of various title insurance coverages and endorsements. If Buyer desires title coverage other than that required by this paragraph, Buyer shall instruct Escrow Holder in writing and pay any increase in cost.

**17.  TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS:** The following time periods may only be extended, altered, modified or changed by mutual written agreement. Any removal of contingencies or cancellation under this paragraph must be in writing (C.A.R. Form CR).

A.  **SELLER HAS: 7 (or ☐ _____ ) Days After Acceptance** to deliver to Buyer all reports, disclosures and information for which Seller is responsible under paragraphs 5, 6A and B, 8A, 11B, 12B (3) and (4) and 16.

B.  **BUYER HAS: 17 (or ☐ _____ ) Days After Acceptance, unless otherwise agreed in writing, to:**

(1)  Complete all Buyer Investigations; approve all disclosures, reports and other applicable information, which Buyer receives from Seller; and approve all matters affecting the Property (including lead-based paint and lead-based paint hazards as well as other information specified in paragraph 6 and insurability of Buyer and the Property).

(2)  Within the time specified in 17B(1), Buyer may request that Seller make repairs or take any other action regarding the Property (C.A.R. Form RR). Seller has no obligation to agree to or respond to Buyer's requests.

(3)  By the end of the time specified in 17B(1) (or 2J for loan contingency or 2K for appraisal contingency), Buyer shall remove, in writing, the applicable contingency (C.A.R. Form CR) or cancel this Agreement. However, if the following inspections, reports or disclosures are not made within the time specified in 17A, then Buyer has 5 (or ☐ _____ ) Days after receipt of any such items, or the time specified in 17B(1), whichever is later, to remove the applicable contingency or cancel this Agreement in writing: (i) government-mandated inspections or reports required as a condition of closing; (ii) Common Interest Disclosures pursuant to paragraph 8B; (iii) a subsequent or amended disclosure pursuant to paragraph 9; (iv) Proposed Changes pursuant to paragraph 10B; and (v) environmental survey pursuant to paragraph 7.

C.  **CONTINUATION OF CONTINGENCY OR CONTRACTUAL OBLIGATION; SELLER RIGHT TO CANCEL:**

(1)  **Seller right to Cancel; Buyer Contingencies:** Seller, after first giving Buyer a Notice to Buyer to Perform (as specified below), may cancel this Agreement in writing and authorize return of Buyer's deposit if, by the time specified in the Agreement, Buyer does not remove in writing the applicable contingency or cancel this Agreement. Once all contingencies have been removed, failure of either Buyer or Seller to close escrow in time may be a breach of this Agreement.

(2)  **Continuation of Contingency:** Even after the expiration of the time specified in 17B, Buyer retains the right to make requests to Seller, remove in writing the applicable contingency or cancel this Agreement until Seller cancels this Agreement pursuant to 17C(1). Once Seller receives Buyer's written removal of all contingencies, Seller may not cancel this Agreement pursuant to 17C(1)

(3)  **Seller right to Cancel; Buyer Contract Obligations:** Seller, after first giving Buyer a Notice to Buyer to Perform (as specified below), may cancel this Agreement in writing and authorize return of Buyer's deposit for any of the following reasons: (i) if Buyer fails to deposit funds as required by 2A or 2B; (ii) if the funds deposited pursuant to 2A or 2B are not good when deposited; (iii) if Buyer fails to provide a letter as required by 2H; (iv) if Buyer fails to provide verification as required by 2I or 2M; or (v) if Seller reasonably disapproves of the verification provided by 2I or 2M. Seller is not required to give Buyer a Notice to Perform regarding Close Of Escrow.

(4)  **Notice To Buyer To Perform:** The Notice to Buyer to Perform (C.A.R. Form NBP) shall (i) be in writing, (ii) be signed by Seller and (iii) give Buyer at least 24 (or ☐ _____ ) hours (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A Notice to Buyer to Perform may not be given any earlier than 2 Days Prior to the expiration of the applicable time for Buyer to remove a contingency or cancel the Agreement or meet an 17C(3) obligation.

D.  **EFFECT OF BUYER'S REMOVAL OF CONTINGENCIES:** If Buyer removes, in writing, any contingency or cancellation rights, unless otherwise specified in a separate written agreement between Buyer and Seller, Buyer shall conclusively be deemed to have: (i) completed all Buyer Investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; (ii) elected to proceed with the transaction; and (iii) assumed all liability, responsibility, and expense for Repairs or corrections pertaining to that contingency or cancellation right, or for inability to obtain financing.

Buyer's Initials ( _____ ) ( _____ )

Seller's Initials ( _____ ) ( _____ )

Reviewed by _____  Date _____

Copyright © 1991-2007, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
**CPA REVISED 10/02 (PAGE 5 OF 10)**



**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 5 OF 10)**

2151 Hotel Cir

2151 Hotel Circle South

Property Address: San Diego, CA 92108                                    Date: April 23, 2010

**E. EFFECT OF CANCELLATION ON DEPOSITS:** If Buyer or Seller gives written notice of cancellation pursuant to rights du... exercised under the terms of this Agreement, Buyer and Seller agree to Sign mutual instructions to cancel the sale and escro... and release deposits, less fees and costs, to the party entitled to the funds. Fees and costs may be payable to service provide... and vendors for services and products provided during escrow. **Release of funds will require mutual Signed releas...** instructions from Buyer and Seller, judicial decision or arbitration award.

**18. FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final inspection of the Property within 5 (or ___ Days Prior to Close Of Escrow, **NOT AS A CONTINGENCY OF THE SALE**, but solely to confirm: (i) the Property is maintain... pursuant to paragraph 11A; (ii) Repairs have been completed as agreed; and (iii) Seller has complied with Seller's other obligation... under this Agreement.

**19. ENVIRONMENTAL HAZARD CONSULTATION:** Buyer and Seller acknowledge: (i) Federal, state, and local legislation impo... liability upon existing and former owners and users of real property, in applicable situations, for certain legislatively define... environmentally hazardous substances; (ii) Broker(s) has/have made no representation concerning the applicability of any such La... to this transaction or to Buyer or to Seller, except as otherwise indicated in this Agreement; (iii) Broker(s) has/have made ... representation concerning the existence, testing, discovery, location and evaluation of/for, and risks posed by, environmental... hazardous substances, if any, located on or potentially affecting the Property; and (iv) Buyer and Seller are each advised to consu... with technical and legal experts concerning the existence, testing, discovery, location and evaluation of/for, and risks posed b... environmentally hazardous substances, if any, located on or potentially affecting the Property.

**20. AMERICANS WITH DISABILITIES ACT:** The Americans With Disabilities Act ("ADA") prohibits discrimination against individuals wi... disabilities. The ADA affects almost all commercial facilities and public accommodations. The ADA can require, among other thing... that buildings be made readily accessible to the disabled. Different requirements apply to new construction, alterations to existi... buildings, and removal of barriers in existing buildings. Compliance with the ADA may require significant costs. Monetary a... injunctive remedies may be incurred if the Property is not in compliance. A real estate broker does not have the technical expertise ... determine whether a building is in compliance with ADA requirements, or to advise a principal on those requirements. Buyer a... Seller are advised to contact an attorney, contractor, architect, engineer or other qualified professional of Buyer's or Seller's ov... choosing to determine to what degree, if any, the ADA impacts that principal or this transaction.

**21. LIQUIDATED DAMAGES:** If Buyer fails to complete this purchase because of Buyer's default, Seller shall retai... as liquidated damages, the deposit actually paid. Buyer and Seller agree that this amount is a reasonable su... given that it is impractical or extremely difficult to establish the amount of damages that would actually b... suffered by Seller in the event Buyer were to breach this Agreement. Release of funds will require mutu... Signed release instructions from both Buyer and Seller, judicial decision or arbitration award.

| Buyer's Initials ___ / ___ | Seller's Initials ___ / ___ |
|---|---|

**22. DISPUTE RESOLUTION:**

**A. MEDIATION:** Buyer and Seller agree to mediate any dispute or claim arising between them out of this Agreement, or any resultir... transaction, before resorting to arbitration or court action. Paragraphs 22B(2) and (3) below apply to mediation whether or not th... Arbitration provision is initialed. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute ... claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter throug... mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, ev... if they would otherwise be available to that party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NC... THE ARBITRATION PROVISION IS INITIALED.

**B. ARBITRATION OF DISPUTES:** (1) Buyer and Seller agree that any dispute or claim in Law or equity arising between them ... out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutra... binding arbitration, including and subject to paragraphs 22B(2) and (3) below. The arbitrator shall be a retired judge ... justice, or an attorney with at least 5 years of real estate transactional Law experience, unless the parties mutually agre... to a different arbitrator, who shall render an award in accordance with substantive California Law. The parties shall hav... the right to discovery in accordance with Code of Civil Procedure §1283.05. In all other respects, the arbitration shall b... conducted in accordance with Title 9 of Part III of the California Code of Civil Procedure. Judgment upon the award of th... arbitrator(s) may be entered into any court having jurisdiction. Interpretation of this agreement to arbitrate shall b... governed by the Federal Arbitration Act.
(2) **EXCLUSIONS FROM MEDIATION AND ARBITRATION:** The following matters are excluded from mediation and arbitratio... (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or installment land sa... contract as defined in Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (i... any matter that is within the jurisdiction of a probate, small claims, or bankruptcy court. The filing of a court action to enable th... recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall n... constitute a waiver of the mediation and arbitration provisions.
(3) **BROKERS:** Buyer and Seller agree to mediate and arbitrate disputes or claims involving either or both Brokers, consistent wi... 22A and B, provided either or both Brokers shall have agreed to such mediation or arbitration prior to, or within a reasonable tim... after, the dispute or claim is presented to Brokers. Any election by either or both Brokers to participate in mediation or arbitratio... shall not result in Brokers being deemed parties to the Agreement.

Copyright © 1991-2007, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 6 OF 10)

| Buyer's Initials ( ___ )( ___ ) |
|---|
| Seller's Initials ( ___ )( ___ ) |
| Reviewed by ___ Date ___ |



**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 6 OF 10)**      2151 Hotel ...

2151 Hotel Circle South
Property Address: San Diego, CA  92108                                          Date: April 23, 2010

"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."

"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."

Buyer's Initials ___/___          Seller's Initials ___/___

23. **ASSIGNMENT:** Buyer shall not assign all or any part of Buyer's interests in this Agreement without first having obtained the written consent of Seller. Such consent shall not be unreasonably withheld, unless otherwise agreed in writing. Any total or partial assignment shall not relieve Buyer of Buyer's obligations pursuant to this Agreement.

24. **SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon, and inure to the benefit of, Buyer and Seller and their respective successors and assigns, except as otherwise provided herein.

25. **COPIES:** Seller and Buyer each represent that Copies of all reports, documents, certificates, approvals and other documents that are furnished to the other are true, correct and unaltered Copies of the original documents, if the originals are in the possession of the furnishing party.

26. **NOTICES:** Whenever notice is given under this Agreement, each notice shall be in writing, and shall be delivered personally, by facsimile, or by mail, postage prepaid. Notice shall be delivered to the address set forth below the recipient's signature of acceptance. Either party may change its notice address by providing notice to the other party.

27. **AUTHORITY:** Any person or persons signing this Agreement represent(s) that such person has full power and authority to bind that person's principal, and that the designated Buyer and Seller has full authority to enter into and perform this Agreement. Entering into this Agreement, and the completion of the obligations pursuant to this contract, does not violate any Articles of Incorporation, Articles of Organization, ByLaws, Operating Agreement, Partnership Agreement or other document governing the activity of either Buyer or Seller.

28. **GOVERNING LAW:** This Agreement shall be governed by the Laws of the state of California.

29. **PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless otherwise agreed in writing, the following items shall be PAID CURRENT and prorated between Buyer and Seller as of Close Of Escrow: real property taxes and assessments, interest, rents, HOA regular, special, and emergency dues and assessments imposed prior to Close Of Escrow, premiums on insurance assumed by Buyer, payments on bonds and assessments assumed by Buyer, and payments on Mello-Roos and other Special Assessment District bonds and assessments that are now a lien. The following items shall be assumed by Buyer WITHOUT CREDIT toward the purchase price: prorated payments on Mello-Roos and other Special Assessment District bonds and assessments and HOA special assessments that are now a lien but not yet due. Property will be reassessed upon change of ownership. Any supplemental tax bills shall be paid as follows: (i) for periods after Close Of Escrow, by Buyer; and (ii) for periods prior to Close Of Escrow, by Seller. TAX BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER. Prorations shall be made based on a 30-day month.

30. **WITHHOLDING TAXES:** Seller and Buyer agree to execute any instrument, affidavit, statement or instruction reasonably necessary to comply with federal (FIRPTA) and California withholding Law, if required (C.A.R. Form AS).

31. **MULTIPLE LISTING SERVICE/PROPERTY DATA SYSTEM:** If Broker is a participant of a Multiple Listing Service ("MLS") or Property Data System ("PDS"), Broker is authorized to report to the MLS or PDS a pending sale and, upon Close Of Escrow, the terms of this transaction to be published and disseminated to persons and entities authorized to use the information on terms approved by the MLS or PDS.

32. **EQUAL HOUSING OPPORTUNITY:** The Property is sold in compliance with federal, state and local antidiscrimination Laws.

33. **ATTORNEY FEES:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney fees and costs from the nonprevailing Buyer or Seller, except as provided in paragraph 22A.

34. **SELECTION OF SERVICE PROVIDERS:** If Brokers refer Buyer or Seller to persons, vendors, or service or product providers ("Providers"), Brokers do not guarantee the performance of any Providers. Buyer and Seller may select ANY Providers of their own choosing.

35. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer and Seller.

Buyer's Initials ( ___ )( ___ )
Seller's Initials ( ___ )( ___ )
Reviewed by _____ Date _____

Copyright © 1991-2002 CALIFORNIA ASSOCIATION OF REALTORS®, INC
CPA REVISED 10/02 (PAGE 7 OF 10)

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 7 OF 10)**

2151 Hotel Cir

2151 Hotel Circle South

Property Address: San Diego, CA  92108                                         Date: April 23, 2010

**36. OTHER TERMS AND CONDITIONS, including attached supplements:**

A. ☐ Buyer Inspection Advisory (C.A.R. Form BIA)
B. ☐ Seller Financing Addendum and Disclosure (C.A.R. Form SFA)
C. ☐ Purchase Agreement Addendum (C.A.R. Form PAA) paragraph numbers:                    )
D. ☐ Addendum No. ___ (C.A.R. Form ADM)
E. ☐ Additional Commercial Supplement (C.A.R. Form CS)
F.   1. *Franchise shall be assumed by Buyer and Seller shall not be liable for any franchise related fee.*
     *2. Master Premise Transfer and all personal property is included in the above price.*
     *3. Inventory of restaurant and bar shall be based on seller's cost and inventory on hand at closing (midnight prior to recording of Deeds. All adjustment items for reconciliation and adjustments shall be submitted to escrow prior to closing.*
     *4. Cash for purchase shall be obtained from a loan secured by the HSBC Bank of London England (Stand By Letter of Credit. Purchase is contingent upon said cash being committed within 14 days and funded by the Lending Bank at close of escrow.*

**37. DEFINITIONS: As used in this Agreement:**

A. "Acceptance" means the time the offer or final counter offer is accepted in writing by a party and is delivered to and personally received by the other party or that party's authorized agent in accordance with this offer or a final counter offer.

B. "Agreement" means the terms and conditions of this accepted Commercial Property Purchase Agreement and any accepted counter offers and addenda.

C. "C.A.R. Form" means the specific form referenced, or another comparable form agreed to by the parties.

D. "Close Of Escrow" means the date the grant deed, or other evidence of transfer of title, is recorded. If the scheduled close escrow falls on a Saturday, Sunday or legal holiday, then close of escrow shall be the next business day after the scheduled close of escrow date.

E. "Copy" means copy by any means including photocopy, NCR, facsimile and electronic.

F. "Days" means calendar days, unless otherwise required by Law.

G. "Days After" means the specified number of calendar days after the occurrence of the event specified, not counting the calendar date on which the specified event occurs, and ending at 11:59PM on the final day.

H. "Days Prior" means the specified number of calendar days before the occurrence of the event specified, not counting the calendar date on which the specified event is scheduled to occur.

I. "Electronic Copy" or "Electronic Signature" means, as applicable, an electronic copy or signature complying with California Law. Buyer and Seller agree that electronic means will not be used by either one to modify or alter the content or integrity of this Agreement without the knowledge and consent of the other.

J. "Law" means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state, federal legislative, judicial or executive body or agency.

K. "Notice to Buyer to Perform" means a document (C.A.R. Form NBP), which shall be in writing and Signed by Seller and shall give Buyer at least 24 hours (or as otherwise specified in paragraph 17C(4)) to remove a contingency or perform as applicable.

L. "Repairs" means any repairs (including pest control), alterations, replacements, modifications and retrofitting of the Property provided for under this Agreement.

M. "Signed" means either a handwritten or electronic signature on an original document. Copy or any counterpart.

N. Singular and Plural terms each include the other, when appropriate.

**38. BROKERAGE:** Neither Buyer nor Seller has utilized the services of, or for any other reason owes compensation to, a licensed real estate broker (individual or corporate), agent, finder, or other entity, other than as specified in this Agreement, in connection with any act relating to the Property, including, but not limited to, inquiries, introductions, consultations and negotiations leading to this Agreement. Buyer and Seller each agree to indemnify, defend, and hold the other, the Brokers specified herein and their agents harmless from and against any costs, expenses or liability for compensation claimed inconsistent with the warranty and representations in this paragraph.

**39. AGENCY:**

A. **POTENTIALLY COMPETING BUYERS AND SELLERS:** Buyer and Seller each acknowledge receipt of a disclosure of the possibility of multiple representation by the Broker representing that principal. This disclosure may be part of a listing agreement, buyer-broker agreement or separate document (C.A.R. Form DA). Buyer understands that Broker representing Buyer may also represent other potential buyers, who may consider, make offers on or ultimately acquire the Property. Seller understands that Broker representing Seller may also represent other sellers with competing properties of interest to this Buyer.

B. **CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction.
Listing Agent          Van Rye, Realtors-Commercial                   (Print Firm Name) is the agent
of (check one): ☐ the Seller exclusively; or ☒ both the Buyer and Seller.
Selling Agent                                                          (Print Firm Name) (if not same
as Listing Agent) is the agent of (check one): ☐ the Buyer exclusively; or ☐ the Seller exclusively; or ☐ both the Buyer and Seller. Real Estate Brokers are not parties to the Agreement between Buyer and Seller.

Copyright © 1991-2007, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 8 OF 10)

Buyer's Initials (              )(              )
Seller's Initials (              )(              )
Reviewed by                    Date

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 8 OF 10)**                    2151 Hotel...

2151 Hotel Circle South

Property Address: San Diego, CA  92108                              Date: April 23, 2010

**40. JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**

A. The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions Buyer and Seller to Escrow Holder, which Escrow Holder is to use along with any related counter offers and addenda, and a additional mutual instructions to close the escrow: 1, 2, 4, 5, 16, 17B, 29, 30, 35, 36B-F, 37, 40, 42, 45A, 46 and paragraph D the section titled Real Estate Broker on page 10. If a Copy of the separate compensation agreement(s) provided for in paragra 42 or 45A, or paragraph D of the section titled Real Estate Broker on page 10 is deposited with Escrow Holder by Broker, Escro Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker compensation provided for in such agreement(s). The terms and conditions of this Agreement not set forth in the specifie paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned Buyer and Seller will receive Escrow Holder's general provisions directly from Escrow Holder and will execute such provision upon Escrow Holder's request. To the extent the general provisions are inconsistent or conflict with this Agreement, the gener provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller will execute additional instruction documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow.

B. A Copy of this Agreement shall be delivered to Escrow Holder within 3 business days after Acceptance (or ( _____ ). Buyer and Seller authorize Escrow Holder to accept and rely on Copies and Signature as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement.

C. Brokers are a party to the Escrow for the sole purpose of compensation pursuant to paragraphs 42, 45A and paragraph D of th section titled Real Estate Broker on page 10. Buyer and Seller irrevocably assign to Brokers compensation specified paragraphs 42 and 45A, respectively, and irrevocably instruct Escrow Holder to disburse those funds to Brokers at Close O Escrow, or pursuant to any other mutually executed cancellation agreement. Compensation instructions can be amended revoked only with the written consent of Brokers. Escrow Holder shall immediately notify Brokers: (i) if Buyer's initial or ar additional deposit is not made pursuant to this Agreement, or is not good at time of deposit with Escrow Holder; or (ii) if Buyer a Seller instruct Escrow Holder to cancel escrow.

D. A Copy of any amendment that affects any paragraph for which Escrow Holder is responsible shall be delivered to Escrow Hold within 2 business days after mutual execution of the amendment.

**41. SCOPE OF BROKER DUTY:** Buyer and Seller acknowledge and agree that: Brokers: (i) do not decide what price Buyer should pa or Seller should accept; (ii) do not guarantee the condition of the Property (iii) do not guarantee the performance, adequacy completeness of inspections, services, products or repairs provided or made by Seller or others; (iv) shall not be responsible fo identifying defects that are not known to Broker(s); (v) shall not be responsible for inspecting public records or permits concerning th title or use of the Property; (vi) shall not be responsible for identifying location of boundary lines or other items affecting title; (vii) sha not be responsible for verifying square footage, representations of others or information contained in inspection reports, MLS or PDS advertisements, flyers or other promotional material, unless otherwise agreed in writing; (viii) shall not be responsible for providir legal or tax advice regarding any aspect of a transaction entered into by Buyer or Seller in the course of this representation; and (b shall not be responsible for providing other advice or information that exceeds the knowledge, education and experience required perform real estate licensed activity. Buyer and Seller agree to seek legal, tax, insurance, title and other desired assistance fro appropriate professional's.

**42. BROKER COMPENSATION FROM BUYER:** If applicable, upon Close Of Escrow, Buyer agrees to pay compensation to Broker a specified in a separate written agreement between Buyer and Broker.

**43. TERMS AND CONDITIONS OF OFFER:** This is an offer to purchase the Property on the above terms and conditions. All paragraph with spaces for initials by Buyer and Seller are incorporated in this Agreement only if initialed by all parties. If at least one but not parties initial, a counter offer is required until agreement is reached. Seller has the right to continue to offer the Property for sale an to accept any other offer at any time prior to notification of Acceptance. Buyer has read and acknowledges receipt of a Copy of th offer and agrees to the above confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buye may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, includin any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing.

**44. EXPIRATION OF OFFER:** This offer shall be deemed revoked and the deposit shall be returned, unless the offer is Signed by Selle and a Copy of the Signed offer is personally received by Buyer, or by ___$500.00___ who is authorized to receive it by 5:00 PM on the third Day after this offer is signed by Buyer (OR, if checked ☐ b APRIL 30-TH (date), at 17 27  ☐ AM ☑ PM).

Buyer Macino Entertainment Hollywood

By _CE_____   Date _4/30/2010_

Print name _____, MYKE MACINO_____

Address c/o Van Rus Realters  City _TARZANA_  State CA Zip 91356

Telephone 818-996-5800  Fax 818-996-1863  E-mail ADANRYSE@realtytimes.com

Buyer _____

By _____   Date _____

Print name _____

Address _____  City _____  State _____  Zip _____

Telephone _____  Fax _____  E-mail _____

Notice Address, if Different _____

Buyers' Initials ( __ )( _____ )

Sellers' Initials ( __ )( _____ )

Reviewed by _____ Date _____

Copyright © 1991-2007, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 9 OF 10)

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 9 OF 10)**

2151 Hotel C

2151 Hotel Circle South

Property Address: San Diego, CA  92108                                              Date: April 23, 2010

**45. BROKER COMPENSATION FROM SELLER:**
   A. Upon Close Of Escrow, Seller agrees to pay compensation to Broker as specified in a separate written agreement between Seller and Broker.
   B. If escrow does not close, compensation is payable as specified in that separate written agreement.

**46. ACCEPTANCE OF OFFER:** Seller warrants that Seller is the owner of the Property, or has the authority to execute this Agreement. Seller accepts the above offer, agrees to sell the Property on the above terms and conditions, and agrees to the above confirmation of agency relationships. Seller has read and acknowledges receipt of a Copy of this Agreement, and authorizes Broker to deliver a Signed Copy to Buyer.
   ☐ (If checked) SUBJECT TO ATTACHED COUNTER OFFER, DATED _____

Seller 2151 Hotel Circle South, LLC _____
By Charles Cavil, Managing Member _____ Date 4/30/2010
Print name Charles Cavil
Address c/o Van Rye REALTORS          City TARZANA          State CA  Zip 91336
Telephone 818-996-5500 Fax 818 996 1065  E-mail MANAGER@REALTYHOMES.COM

Seller _____
By _____ Date _____
Print name _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____
Notice Address, If Different _____

( [initials] ) Confirmation of Acceptance: A Copy of Signed Acceptance was personally received by Buyer or Buyer's authorized agent on (date) _____ at _____ ☐ AM ☐ PM. A binding Agreement is created when a Copy of Signed Acceptance is personally received by Buyer or Buyer's authorized agent whether or not confirmed in this document. Completion of this confirmation is not legally required in order to create a binding Agreement; it is solely intended to evidence the date that Confirmation of Acceptance has occurred.

---

**REAL ESTATE BROKERS:**
A. Real Estate Brokers are not parties to the Agreement between Buyer and Seller.
B. Agency relationships are confirmed as stated in paragraph 39 above.
C. If specified in paragraph 2A, Agent who submitted offer for Buyer acknowledges receipt of deposit.
D. COOPERATING BROKER COMPENSATION: Listing Broker agrees to pay Cooperating Broker (Selling Firm) and Cooperating Broker agrees to accept, out of Listing Broker's proceeds in escrow: (i) the amount specified in the MLS or PDS, provided Cooperating Broker is a Participant of the MLS or PDS in which the property is offered for sale or a reciprocal MLS or PDS, or (ii) ☐ (if checked) the amount specified in a separate written agreement (C.A.R. Form CBC) between Listing Broker and Cooperating Broker.

Real Estate Broker (Selling Firm) _____ DRE Lic # _____
By _____ DRE Lic # _____ Date _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

Real Estate Broker (Listing Firm) Van Rye, Realtors-Commercial    DRE Lic # 01391276
By _____ DRE Lic # _____ Date _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

---

**ESCROW HOLDER ACKNOWLEDGMENT:**
Escrow Holder acknowledges receipt of a Copy of this Agreement, (if checked, ☐ a deposit in the amount of $ _____ ),
counter offer numbers _____ and _____, and agrees to act as Escrow Holder subject to paragraph 40 of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.

Escrow Holder is advised that the date of Confirmation of Acceptance of the Agreement as between Buyer and Seller is _____

Escrow Holder Chicago Title _____ Escrow # _____
By _____ Date _____
Address _____
Phone/Fax/E-mail // _____
Escrow Holder is licensed by the California Department of ☐ Corporations, ☐ Insurance, ☐ Real Estate. License # _____

---

( [initials] ) **REJECTION OF OFFER:** No counter offer is being made. This offer was reviewed and rejected by Seller on
   (Seller's initials)                              (Date)

---

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

CPA REVISED 10/02 (PAGE 10 OF 10)

Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 10 OF 10)**

# EXHIBIT 2

List Of Creditors Holding 20 Largest Unsecured Claims
In re 2151 Hotel Circle South, LLC
Chapter 11

| Creditor | Nature of Claim | Amount of Claim |
|---|---|---|
| Aquatic Quality Assurance<br>518 Larchwood Drive #A10<br>San Marcos, CA 92069<br>760-801-6540 | Vendor | $1,900.00 |
| California Travel & Tourism<br>P.O. Box 2007<br>Sacramento, CA 95812-2007 | State Assessment | $1,772.00 |
| California Travel Industry Assoc.<br>414 K Street, Suite #305<br>Sacramento, CA 95814-3967 | Dues | $1,526.36 |
| Cintas Corporation<br>97627 Eagle Way<br>Chicago, IL 60678-9760<br>800-864-3676 | Vendor | $2,962.46 |
| City of San Diego, TOT Dept.<br>P.O. Box 122289<br>San Diego, CA 92212 | Occupancy Tax | $66,808.00 |
| Deep Blue Wireless<br>12 Elmwood Road<br>Menands, NY 12204 | Vendor | $566.00 |
| Detergent Services<br>P.O. Box 600031<br>San Diego, CA 92160<br>619-454-2580 | Vendor | $1,453.27 |
| Leslie's Pool Supply<br>P.O. Box 501162<br>St. Louis, MO 63150-1162<br>602-366-3789 | Vendor | $3,530.74 |
| Konica Minolta<br>P.O. Box 41602<br>Philadelphia, PA 19101-1602 | Vendor/ Lessor | $628.04 |
| MarComet<br>P.O. Box 368<br>Tranquility, NJ 07879 | Vendor | $1,608.29 |
| Konica Minolta Business Solutions<br>P.O. Box 100706<br>Pasadena, CA 91189-0706 | Vendor/ Lessor | $712.33 |
| Neal Electric<br>P.O. Box 1655<br>Poway, CA 92064 | Vendor | $5,371.46 |

| 858-513-2525 | | |
|---|---|---|
| Onity<br>2232 Northmont Parkway<br>Duluth, GA 30096 | Vendor | $2,078.11 |
| Ramada Worldwide Inc.<br>15018 Collections Center Drive<br>Chicago, IL 60693<br>800-221-7648 | Franchise Fees | $42,804.37 |
| Reliable Elevator<br>8245 Ronson Road, Suite K<br>San Diego, CA 92111<br>858-874-3400 | Vendor | $833.42 |
| San Diego Bus and Auto Repair Inc.<br>2216 Catalina Blvd.<br>San Diego, CA 92107<br>619-222-4520 | Vendor | $767.16 |
| San Diego Visitor's Info<br>2688 E. Mission Bay Drive<br>San Diego, CA 92109<br>619-276-8200 | Vendor/<br>Dues | $2,800.00 |
| Sandiego.com<br>610 West Ash Street #1405<br>San Diego, CA 92101<br>619-220-8601 | Vendor | $900.00 |
| State Chemical Mfg. Co.<br>P.O. Box 74189<br>Cleveland, OH 44194-0268<br>216-861-7114 | Vendor | $1,147.79 |
| The City of San Diego-Water<br>Water Department<br>San Diego, CA 92187-0001 | Vendor/<br>Utility | $7,392.04 |